IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

CLIFFTON W. BRIDGES                                              PLAINTIFF

                    v.                    Civil No. 10-3107

MICHAEL J. ASTRUE, Commissioner
Social Security Administration                                  DEFENDANT

<u>**MEMORANDUM OPINION**</u>

        Plaintiff, Cliffton Bridges, brings this action under 42 U.S.C. § 405(g), seeking judicial review

of a decision of the Commissioner of Social Security Administration (Commissioner) denying his claim

for a period of disability, disability insurance benefits ("DIB"), and supplemental security income

("SSI") under Titles II and XVI of the Social Security Act (hereinafter "the Act"), 42 U.S.C. §§

423(d)(1)(A), 1382c(a)(3)(A).   In this judicial review, the court must determine whether there is

substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C.

§ 405(g).

**I.       Procedural Background:**

        The plaintiff filed his applications for DIB and SSI on May 15, 2008, alleging an onset date of

August 15, 2007, due to chest pain following surgery to remove his sternum in 2001, cognitive

dysfunction, knee pain, back pain, and occasional shoulder pain.  Tr. 10, 131-143, 164, 191, 200-202.

His claims were denied both initially and upon reconsideration.  Tr. 81, 84, 90, 92.  An administrative

hearing was then held on April 26, 2010.  Tr. 27-76.  Plaintiff was present and represented by counsel.

        At the time of the administrative hearing, plaintiff was 32 years of age and possessed a high

school education and two years of college credit.  Tr. 35-36.  He was attending college, seeking to obtain

an Associate's Degree in nursing.  Tr. 36-37.  Plaintiff had past relevant work ("PRW") as a forklift

operator, gluing machine off bearer, poultry dresser, and casting house operator.  Tr. 43-47, 165. 197.

On October 22, 2010, the Administrative Law Judge ("ALJ") concluded that, although severe, plaintiff's status post pectorus excavatum[1] correction did not meet or equal any Appendix 1 listing. Tr. 12-17. The ALJ determined that plaintiff maintained the residual functional capacity ("RFC") to perform light work requiring only occasional pushing/pulling with his bilateral upper extremities, overhead reaching, and exposure to extremes of temperature and humidity. She also concluded Plaintiff would be unable to climb ladders/ropes/scaffolds, perform outside work, and tolerate exposure to unprotected heights. Tr. 17-21. With the assistance of a vocational expert, the ALJ then found that plaintiff could perform work as a cashier II, machine tender, and inspector/tester. Tr. 22-23.

Plaintiff appealed this decision to the Appeals Council, but said request for review was denied on September 15, 2010. Tr. 3-5. Subsequently, plaintiff filed this action. ECF No. 1. This case is before the undersigned by consent of the parties. Both parties have filed appeal briefs, and the case is now ready for decision. ECF Nos. 8, 9.

## II.    **Applicable Law:**

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007). Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Id*. "Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision." *Id.* As long as there is substantial evidence in the record to support the Commissioner's decision, the court may not reverse the decision simply because substantial

---

[1]"Pectus excavatum is a birth defect that causes the chest to look sunken. The defect is caused by abnormal development before birth of the tissue that joins the ribs and the breastbone (sternum)." Mayo Clinic, *Pectus Excavatum*, http://www.mayoclinic.org/pectus-excavatum/ (last visited February 16, 2012). Surgery is recommended for two main reasons: 1) To correct physical limitations, such as reduced exercise tolerance, chest discomfort and breathing problems and 2) To improve body image." *See Pectus Excavatum*, http://www.mayoclinic.org/pectus-excavatum/treatment.html (last visited February 16, 2012).

2

evidence exists in the record to support a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). If we find it possible "to draw two inconsistent positions from the evidence, and one of those positions represents the Secretary's findings, we must affirm the decision of the Secretary." *Cox*, 495 F.3d at 617 (internal quotation and alteration omitted).

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

A.    **The Evaluation Process**:

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his or her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his or her age, education, and experience. *See* 20 C.F.R. § § 404.1520(a)- (f)(2003). Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his or her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. § § 404.1520, 416.920 (2003).

3

### III.    __Evidence Presented__:

In March 2001, Plaintiff presented in the emergency room with a pectus deformity and complaints of intermittent right-sided pleuritic chest wall pain. Tr. 223-224. Upon presentation, the pain had subsided, leaving him with a non-productive dry cough. Plaintiff had also noticed intermittent claudication in both of his arms and legs, but denied gastrointestinal complaints or impairments in bowel or bladder function. An examination revealed an obvious pectus deformity in the middle of the chest. His myocardium was palpable along the left ridge. He had no appreciable mass in the subxiphoid area. X-rays revealed an obvious pectus deformity with displacement of the left ventricle into the left chest. Dr. Seth Barnes referred Plaintiff to Dr. Jon Spiers for consideration of repair. Tr. 223-224.

Although there are no records documenting his surgery, on May 2, 2001, Dr. Barnes indicated that Plaintiff had recovered from pectus repair surgery and now wanted to return to work. Tr. 222. Accordingly, he was granted a work release. Tr. 222. It appears that Plaintiff worked for approximately six years before being laid off in 2007.

On May 21, 2008, Plaintiff complained of chest pain and crepitus in his chest. Tr. 238. He stated that he had been laid off for a few weeks, during which time his pain had improved. However, Plaintiff indicated that any activity involving his upper extremities exacerbated his pain. Dr. Kevin Jackson noted that Plaintiff's affect was both normal and appropriate. An examination revealed no abnormalities related to his chest. Dr. Jackson diagnosed Plaintiff with pectus excavatum and unspecified chest pain. He prescribed Mobic. Tr. 238.

On June 24, 2008, Plaintiff continued to complain of chest wall pain, stating that the Mobic was not helping. Tr. 237. His affect remained normal and appropriate. Dr. Jackson diagnosed him with pectus excavatum and unspecified chest pain. He prescribed Darvocet and recommended Plaintiff see a thoracic surgeon. Tr. 237.

AO72A
(Rev. 8/82)

On July 14, 2008, a CT scan of Plaintiff's chest revealed findings consistent with prior chest wall surgery and right middle lobe scarring or actelectasis (collapse of part or all of a lung).  Tr. 252.

On July 17, 2008, Plaintiff was treated by Dr. Sirish Parvathaneni, a cardiovascular and thoracic surgeon.  Tr. 250-251.  Dr. Parvathaneni noted that Plaintiff had been referred due to sternal chest pain after a pectus excavatum repair with a bar.  He had reportedly returned to work too quickly after surgery, and the bar had to be removed.  Plaintiff now complained of persistent pain in the pectus repair area.  He had a large medial sternotomy incision with some sternal instability in the lateral edges.  Dr. Parvathaneni's exam also revealed pain and point tenderness on the lateral edges of the costochondral resection.  He reported that the pain worsened with any exercise or heavy activity.  The remainder of his physical examination was unremarkable.  After reviewing chest x-rays, Dr. Parvathaneni recommended non-steroidals, warm compresses, and pain medication.  He also recommended a CT scan of his chest. Tr. 250-251.

On September 1, 2008, Plaintiff presented in the emergency room with complaints of acute chest pain and palpitation.  Tr. 254-268.  Aside from findings consistent with his previous surgery, a chest x-ray was negative.  He was diagnosed with palpitations and chronic chest wall pain.  A holter monitor was ordered, and Plaintiff was released home.  Tr. 254-268.

On September 19, 2008, Dr. Vann Smith conducted a neuropsychological evaluation of Plaintiff. Tr. 240-243.  At the onset, Dr. Smith noted that Plaintiff's medical records had been requested, but had not been reviewed.  According to Dr. Smith, Plaintiff presented with a history of neurocognitive symptoms including impaired recall memory, affective lability, impaired attention to sequential detail, sleep pattern disturbance, impaired concentration, word finding impairment, and dysexecutivism. Plaintiff reported problems related to a congenital sternal anomaly which required rather extensive thoracic surgical intervention, recurring pulmonary difficulties post surgery, a history of several closed head injuries (martial arts activities) with Grade II concussion, and chronic chest pain.  Following the

5

administration of a neuropsychodiagnostic battery of tests, Dr. Smith noted findings associated with cerebrovascular, hypoxic, toxic, or metabolic encephalopathies; traumatic brain insult; and, the dysregulation of key central neurochemistry believed to be precipitated by the brain and spinal cord's adaptive responses to chronically painful disease process.  Dr. Smith estimated his IQ to lie within the normal range.  He then diagnosed Plaintiff with cognitive dysfunction, although Plaintiff exhibited mildly impaired memory, intact judgment and insight, a mildly anxious mood, fluent and logical speech, and no evidence of associational anomaly.  Tr. 240-243.

Dr. Smith also completed a mental RFC assessment.  Tr. 244-248.  Again, he diagnosed Plaintiff with cognitive dysfunction, noting that he had conducted a single clinical visit with Plaintiff.  Dr. Smith assessed Plaintiff with a current GAF of 40 and rated his prognosis to be only fair.  He then indicated that Plaintiff would be unable to meet competitive standards with regard to remembering work-like procedures; maintaining attention for two hour segments; maintaining regular attendance and being punctual within customary, usually strict tolerances; sustaining an ordinary routine without special supervision; working in coordination with or proximity to others without being unduly distracted; completing a normal workday and workweek without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; understanding, remembering, and carrying out detailed instructions; setting realistic goals or making plans independently of others; and, dealing with the stress of semiskilled and skilled work.  Dr. Smith also opined that Plaintiff would be seriously limited, but not precluded from understanding, remembering, and carrying out very short and simple instructions; accepting instructions and responding appropriately to criticism from supervisors; getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; responding appropriately to changes in a routine work setting; dealing with normal work stress; and being aware of normal hazards and taking appropriate

precautions.  He then concluded that Plaintiff's psychiatric condition would exacerbate Plaintiff's non-

psychogenic pain, resulting in him likely missing more than four days of work per month.  Tr. 244-248.

On November 5, 2008, Plaintiff underwent a mental diagnostic evaluation with Dr. W. Charles

Nichols.  Tr. 299-303.  Plaintiff stated that he was unable to work due to physical problems following

surgery in 2001 to correct a birth defect.  Plaintiff reported that a concrete fixture was placed in his chest

in the place of his breastbone and that his ribs now float and rub against the fixture, causing constant

pain with movement.   He also complained of short-term memory deficits, claiming to forget

conversations within 20 minutes of having them and forgetting his destination when driving.  Plaintiff

denied a history of serious head trauma or exposure to toxins, although he did report being kicked in the

head about 5 years earlier in a martial arts tournament.  However, he denied losing consciousness and

stated that he did not seek treatment following the injury.  Further, Plaintiff denied personality changes

following the injury, and reported no problematic symptoms of depression.  Tr. 299-303.

Dr. Nichols noted that Plaintiff was pleasant and highly cooperative throughout the evaluation.

Tr. 299-303.  He made good eye contact and exhibited adequate socialization skills.  His affect was

appropriate with normal range, intensity, and content.  Plaintiff had a sense of humor, but was also

serious at other times.  He exhibited an appropriate range of facial expressions and vocal inflection.

Plaintiff's speech was of normal rate, volume, and articulation, was easily understood, and he had an

average oral vocabulary.  He answered questions cogently in a goal-directed manner.  Testing revealed

that his immediate auditory memory was intact, as was his delayed recall memory.  Due to the lack of

objective findings during the assessment to support Plaintiff's allegations of recent memory deficits, Dr.

Nichols deferred his diagnosis and recommended objective cognitive and memory testing to determine

the extent/severity of his symptoms.  Dr. Nichols assessed Plaintiff with a GAF of 55-60, noting no

distractibility, concentration deficits, observable signs of mental fatigue or loss of persistence, or signs

of psychomotor slowing.  Plaintiff responded with adequate to above average pace.  However, poor mental efficiency was observed. Tr. 299-303.

On November 9 and December 8, 2008, Plaintiff sought emergency treatment for an irregular heartbeat.  Tr. 346-348.  He stated that it felt as though his heart was skipping a beat and seemed to take his breath away.  Plaintiff indicated that he had previously worn a holter monitor, but never followed-up regarding the results.  A chest x-ray was unchanged, showing no acute abnormality.  Tr. 346-348.

On February 23, 2009, cardiologist Dr. Ron Revard treated Plaintiff for premature ventricular contractions (PVC's) and chest pain.  Tr. 325.  An examination revealed no abnormalities.  He had a regular heart rate and rhythm.  Dr. Revard diagnosed Plaintiff with PVC's and status post chest reconstruction/pectus excavation.  He suggested SED, but Plaintiff had no insurance and wished to defer treatment.  Tr. 325. Although it is not clear what Dr. Revard meant by SED, it appears that he might have been referring to obtaining a blood sample to determine Plaintiff's sedentary rate.  This information is often used to diagnose or monitor the progress of an inflammatory disease.  Mayo Clinic, *Sed rate (erythrocyte sedimentation rate)*, http://www.mayoclinic.com/health/sed-rate/MY00343 (last visited February 17, 2012).

On December 14, 2009, Plaintiff was evaluated by Dr. Stephen Harris.  Tr. 326-338.  Dr. Harris conducted a mental diagnostic evaluation and intellectual assessment, including a neuropsychological battery, a WIAT, a WRAT, and a CARB.  At the onset, Dr. Harris noted that he had reviewed the evaluations of both Drs. Smith and Nichols.  Plaintiff indicated that he was applying for disability due to unsuccessful surgery to repair his pectus excavatum.  He indicated that the surgery was performed because his lung was pressing on his heart.  During the procedure, his sternum was removed and replaced with cement and a bar.  Because he returned to work too quickly following surgery, Plaintiff stated that the bar broke loose and came through his skin.  He underwent a second operation to remove the bar.  Plaintiff reported that his doctors told him to stop doing factory work because this would cause him

8

further difficulties.  In addition to his physical disability, Plaintiff also reported being easily distracted and forgetful.  He stated that he could not afford a physician or medications and was not seeing a mental health professional.  Tr. 326-338.

Dr. Harris noted that Plaintiff's mood and affect were within normal limits, he was easily understood and could communicate effectively, and had spontaneous and well organized thoughts.  Tr. 326-338.  The results of the WAIS-II revealed a full scale IQ of 110 with a 10-point difference between his verbal and performance scores.  Dr. Harris indicated that this type of split may indicate some difficulties with concentration and/or visual perception.  Scores on the WIAT-II revealed average range abilities in word reading, numerical operations, and spelling.  This was commensurate with his intellectual ability.  The WRAT-IV also indicated achievement in the average range in word reading and spelling and above average skills in math computation.  This placed him at above a 12.9 grade level in word reading, spelling, and math computation. The results of the Luria-Nebraska Neuropsychological Battery indicated no gross organic difficulties.  The CARB indicated that he gave good effort throughout the testing, rendering the assessment valid.  Dr. Harris diagnosed Plaintiff with adjustment disorder with anxiety and pain disorder associated with both psychological factors and general medical condition.  He then assessed Plaintiff with a GAF of 55.  Dr. Harris concluded that Plaintiff could communicate and interact in a socially adequate manner, cope with basic work-like tasks, concentrate and attend in most situations, persist in completing tasks, perform work-like tasks in an acceptable timeframe, and manage his own payments.  Tr. 326-338.

On April 14, 2010, Plaintiff was treated in the emergency room for chest pain and shortness of breath.  Tr. 349-354.  X-rays of his chest and ribs revealed no acute abnormalities or rib fractures.  Tr. 353.  The doctor diagnosed him with a contusion to his chest and prescribed Vicodin.  Tr. 349-354.

On April 28, 2010, Dr. Roy Lee completed an RFC Questionnaire.  Tr. 357-361.  He indicated that he had been treating Plaintiff twice per year for four years for status post surgery pectus evacatum

9

pain.  Dr. Lee indicated that his prognosis was poor.  He characterized Plaintiff's pain as constant, sharp, and stabbing; knife-like.  Dr. Lee opined that emotional factors did not contribute to the severity of Plaintiff's symptoms and functional limitations.  However, he concluded that Plaintiff's pain would be severe enough to constantly interfere with the attention and concentration needed to perform even simple work tasks.  Further, Dr. Lee stated Plaintiff could tolerate moderate stress and routine activity.  He was of the opinion Plaintiff could walk two blocks without rest or severe pain; sit, stand, and walk for about four hours during an eight-hour workday; would require a 5 minute walking break every 90 minutes; and, would require approximately 4 unscheduled breaks during an 8-hour workday lasting approximately 10 minutes each.  Dr. Lee also found that Plaintiff could lift up to 10 pounds frequently, rarely lift 20 pounds, and never lift 50 pounds.  Plaintiff could also rarely stoop, crouch, and climb ladders and never twist.  Further, as a result of his impairment, Plaintiff would be likely to miss more than four days of work per month.  Dr. Lee then indicated that Plaintiff could twist objects with both hands only 80% of the time and reach overhead with both arms only 5% of the time.  He also noted that temperature and humidity aggravated his pain.  Tr. 357-361.

**IV.**     **Discussion:**

Plaintiff contends that the ALJ erred in failing to find Plaintiff's adjustment disorder to be a severe impairment and develop the record further with regard to Dr. Lee's RFC assessment.  We will begin our analysis with a review of Plaintiff' subjective complaints, including the evidence regarding his adjustment disorder.

**A.**     **Subjective Complaints:**

An ALJ may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.  *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).  The ALJ is required to take into account the following factors in evaluating the credibility of a claimant's subjective complaints:  (1) the claimant's daily activities; (2) the duration, frequency, and

intensity of the pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions. *See id.* The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints. *Masterson v. Barnhart,* 363 F.3d 731, 738 (8th Cir.2004). However, the ALJ need not explicitly discuss each *Polaski* factor. *Strongson v. Barnhart,* 361 F.3d 1066, 1072 (8th Cir.2004). The ALJ only need acknowledge and consider those factors before discounting a claimant's subjective complaints. *Id.* Even so, the ALJ may discount a claimant's subjective complaints if there are inconsistencies between the alleged impairments and the evidence as a whole. *Dunahoo v. Apfel*, 241 F.3d 1033, 1037 (8th Cir. 2001); *Hogan v. Apfel,* 239 F.3d 958, 961 (8th Cir. 2001).

The standard of evaluation is not whether plaintiff experiences pain, but if the pain alleged is intense enough to cause functional limitations. *Gowell v. Apfel,* 242 F.3d 793, 796 (8th Cir. 2001) (holding that the real issue is not whether the plaintiff is experiencing pain, but how severe and whether it prevents him from performing any kind of work).

### 1.      Physical  Limitations:

The record reveals that Plaintiff had been diagnosed with pectus excavatum and had undergone surgery repair in 2001.  In May 2001, Plaintiff requested that he be released to return to work, and a work released was granted.  Because he returned to work prematurely, Plaintiff stated that he had to undergo a second surgery, during which the bar originally placed in his chest for support had to be removed.  As a result, he reported chronic chest pain.

However, we note that plaintiff worked with this impairment for approximately six years before alleging disability beginning in August 2007.  *See Goff v. Barnhart,* 421 F.3d 785, 793 (8th Cir. 2005) (Absent a showing of deterioration, working after the onset of an impairment is some evidence of an ability to work.)  The records reveal that he was laid off in 2007 and drew unemployment benefits for the third and fourth quarters of 2007.  Tr. 145-159, 164.  *Salts v. Sullivan,* 958 F.2d 840, 846 n. 8 (8th

11

Cir. 1992) (holding acceptance of unemployment benefits, which entails an assertion of the ability to work, is facially inconsistent with a claim of disability).  Aside from his contention that he could no longer work after this time due to chronic chest pain, we can find no evidence to indicate that Plaintiff's condition worsened or rendered him incapable of working.  In fact, the medical evidence documenting Plaintiff's alleged chronic and severe pain is sparse.  Plaintiff first sought treatment for pain in September 2007.  However, he did not seek any further treatment until May 2008, when he was treated for unspecified chest pain and prescribed Mobic.  The Mobic apparently did not affect Plaintiff's pain, so he returned to Dr. Kevin Jackson's office in June 2008, at which time he was prescribed Darvocet. A CT scan conducted shortly thereafter revealed right middle lobe scarring or actelctasis.  Dr. Parvathaneni then treated Plaintiff in July, prescribing non-steroidals, warm compresses, and pain medication.

Plaintiff sought treatment for chest pain and palpitations on one occasion in September 2008, at which time a holter monitor was prescribed.  Plaintiff wore the monitor as advised, but failed to follow-up concerning the results.  He did not seek out further treatment until November and December 2008.  On both occasions, he complained of his heart skipping a beat.  Chest x-rays revealed no acute abnormalities.  Plaintiff did not return for further treatment until February 2009, when Dr. Revard diagnosed him with PVC's and status post chest reconstruction/pectus excavation.  At this time, Plaintiff opted to defer treatment, stating he had no insurance.  Over one year passed before Plaintiff voiced further complaints regarding chest pain.  In April 2010, he was diagnosed with a contusion to his chest and prescribed Vicodin.  X-rays were once again negative.

Physical exams conducted during the relevant time period were essentially unremarkable.  *See Forte v. Barnhart*, 377 F.3d 892, 895 (8th Cir. 2004) (holding that lack of objective medical evidence is a factor an ALJ may consider).  And, in spite of Plaintiff's contention of severe, chronic chest pain, he continued to teach martial arts classes on a part-time basis.  He was also enrolled in nursing classes,

which required him to participate in clinicals at the hospital.  During these clinicals, Plaintiff was required to perform the duties of a nurse, which we note to be medium level work, in order to demonstrate his mastery of the skills required for each unit of study.  *See* 20 C.F.R. § 404.1571 ("Even if the work you have done was not substantial gainful activity, it may show that you are able to do more work than you actually did.  We will consider all of the medical and vocational evidence in your file to determine whether or not you have the ability to engage in substantial gainful activity."); *Curran-Kicksey v. Barnhart*, 315 F.3d 964, 969 (8th Cir. 2003) (holding that even part-time work is inconsistent with claim of disability).

He also failed to  seek out consistent treatment for his pain, and there is no indication that he was consistently prescribed pain medication or that his treatment consisted of anything other than conservative measures.  *See Rankin v. Apfel*, 195 F.3d 427, 430 (8th Cir. 1999) (holding fact that Plaintiff took over the counter medication for pain relief detracts from her claim); *Smith v. Shalala*, 987 F.2d 1371, 1374 (8th Cir. 1993) (holding that treating physician's conservative treatment was inconsistent with plaintiff's allegations of disabling pain).  In fact, Plaintiff testified that he had not been back to see his cardiologist due to money, and because his pain had eased up and his PVC's were not happening as often.  He also stated that the doctor had told him that his complaints could just be a "normal thing." Tr. 56.  *See Raney v. Barnhart*, 396 F.3d 1007, 1010 (8th Cir. 2005) (none of the claimant's *treating* physicians opined the claimant was so impaired or disabled that the claimant could not work at any job).

Therefore, although it is clear that plaintiff suffers from some degree of impairment related to her scoliosis that is likely exacerbated to some degree by her obesity, she has not established that she is unable to engage in any and all gainful activity.  *See Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000) (holding that mere fact that working may cause pain or discomfort does not mandate a finding of disability); *Woolf v. Shalala*, 3 F.3d at 1213 (holding that, although plaintiff did have degenerative disease of the lumbar spine, the evidence did not support a finding of disabled).  Neither the medical

13

evidence nor the reports concerning his daily activities supports plaintiff's contention of a total physical disability.

### a.     __Financial Hardship:__

Plaintiff contends he was unable to obtain prescription medications and seek out more consistent treatment due to a lack of insurance and financial constraints.  We note that Plaintiff did not seek treatment for his condition from a primary care physician, rather went to the emergency room, which he also blamed on his lack of insurance.  However, the record is devoid of any evidence showing that Plaintiff had been denied access to medical treatment or prescription pain medications on account of his financial constraints. *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (holding that the ALJ correctly discounted the plaintiff's subjective complaints when there was no evidence that the plaintiff was ever denied medical treatment due to financial reasons).  There is also no evidence that he sought out indigent or reduced rate medical treatment or medication.  When asked about this, he testified that he had not sought out services from clinics in the area offering services to uninsured individuals because he had been told that they would send him a packet of forms to fill out and return, and by the time he filled them out and returned them, his impairment would likely be resolved.  We find this to be an odd statement, given the fact that he claims his pain to be chronic in nature.  At any rate, we do not believe his failure to obtain consistent treatment and pain medication is excused by his financial hardship.

### b.     __Non-severe Impairments:__

Plaintiff has also alleged disabling knee, shoulder, and back pain as grounds for disability.  A "severe impairment is defined as one which 'significantly limits [the claimant's] physical or mental ability to do basic work activities.'" *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006)  (quoting 20 C.F.R. § 404.1520©).  The impairment must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by medical evidence consisting of signs, symptoms,

14

and laboratory findings, not only by [the claimant's] statement of symptoms (*see* [20 C.F.R.] § 404.1527). 20 C.F.R. § 404.1508.

The ALJ concluded that Plaintiff's knee impairment was not a medically determinable impairment. Tr. 12-13. Plaintiff testified that he had been experiencing knee problems since he was 15 or 17 years old, when he was working at a grocery store and a frozen turkey was knocked off the counter striking him in the knee. However, aside from one record dated May 2000, Plaintiff did not seek treatment for this impairment. Tr. 288-292. And, at that time, Plaintiff was diagnosed with left knee strain after x-rays were negative. He had a decreased range on motion in the left knee, but no effusion. Tr. 288-292. As there is no evidence dated during the relevant time period to indicate that Plaintiff continued to experience knee pain, we find substantial evidence to support the ALJ's finding of a no medically determinable impairment. *See Edwards v. Barnhart*, 314 F.3d at 967 (holding that ALJ may discount disability claimant's subjective complaints of pain based on the claimant's failure to pursue regular medical treatment).

Plaintiff also complained of periodic back pain, primarily in his upper back, as a residual of the surgery to repair his pectus excavatum. However, we can find no evidence to show that Plaintiff was ever treated for back pain. Likewise, there is no evidence of limitations regarding Plaintiff's back. *See Forte v. Barnhart*, 377 F.3d 892, 895 (8th Cir. 2004) (holding that lack of objective medical evidence is a factor an ALJ may consider). Accordingly, the ALJ's findings will stand.

In addition, Plaintiff testified to experiencing pain in his shoulders because he uses them instead of his chest muscles. He reported an accident at work that resulted in a tear to one of his rotator cuffs and a sprain to the other. As a result, he was placed on light duty for a couple of weeks and paid workers' compensation benefits for his missed work. However, once again, there is no evidence dated during the relevant time period to document any limitations or pain related to his shoulders. The only evidence of record is dated 1995, when Plaintiff fell and injured his right shoulder. Tr. 297-298. X-rays

15

revealed no fractures, and Plaintiff was diagnosed with a contusion to his right shoulder.  Tr. 297-298.

Therefore, given the lack of evidence to show that Plaintiff complained of or sought out treatment for

a shoulder related impairment, we find substantial evidence to support the ALJ's conclusion that Plaintiff

has produced no evidence of a medically determinable impairment.  *See id*.

### 2.    Mental Limitations:

Although not listed on his application paperwork, Plaintiff also contends disability due to

cognitive dysfunction and adjustment disorder with anxiety.   In reviewing the evidence, we note that

Dr. Smith was the only doctor to diagnose Plaintiff with a cognitive disorder.  This evaluation and

assessment makes clear that it is based solely on Plaintiff's subjective complaints and reported medical

history.  Dr. Smith indicated that medical records had been requested, but none were reviewed prior to

the completion of his assessment.  And, it appears that Dr. Smith gave great weight to Plaintiff's reports

of multiple head injuries resulting in Grade II concussions.  Interestingly, however, when examined by

Dr. Nichols, Plaintiff denied suffering any severe head injuries or experiencing any concussions.  Tr.

299-303.  He also told both doctors that, although he had been kicked in the head during a martial arts

tournament, he did not seek out medical treatment following the incident.

Further, the record reveals that Plaintiff was enrolled in a program to obtain an Associate's

Degree in Nursing.  At the hearing, he testified that he was currently enrolled in nine credit hours.

Plaintiff explained that he attended classes two days per week, spending six hours per week at the

hospital doing clinical rotations and four hours per week in lecture.  His current GPA was a 3.05.

Although he reported memory and concentration problems, Plaintiff stated that his schooling required

a great deal of  studying, reading, memorization, and focus.  Tr. 38-39.  And, we note that nursing

programs are noted for their rigorousness.  Clearly, had Plaintiff been suffering from cognitive

dysfunction as alleged by Dr. Smith, he would not have been performing so well in the nursing program.

Thus, given the subjective nature of Dr. Smith's assessment and the overwhelming weight of the

AO72A
(Rev. 8/82)

remaining evidence, we agree with the ALJ's determination that Dr. Smith's assessment was not entitled to controlling weight. *See Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006) (ALJ may elect in certain circumstances not to give controlling weight to treating physician's opinion, as record must be evaluated as whole).

We also note that Dr. Harris concluded that Plaintiff had some difficulties with concentration in non-verbal tasks. He also stated that a great deal of Plaintiff's difficulties seemed to be in line with his frustration concerning his physical ability and his ability to maintain a livelihood. As such, Dr. Harris diagnosed Plaintiff with adjustment disorder with anxiety. However, there is no evidence in the record to show that Plaintiff ever sought out treatment, inpatient or outpatient, for any alleged mental impairments. There is also no evidence to indicate that Plaintiff complained of concentration or memory difficulties, aside from his reports during the consultative mental and neuropsychological exams. Further, given the fact that he was enrolled in a nursing program and maintained a 3.05 GPA, we find this to contradict Plaintiff's complaints of both concentration and memory problems. As Plaintiff himself stated, the program required a great deal of memorization and focus, and his grades reflected that he was able to do both.

### 3.      **Wife's Statement:**

Plaintiff's wife also presented a written statement on Plaintiff's behalf. We note, however, her financial interest in the outcome of this matter. And, it is clear that the ALJ properly considered her statement, but found it unpersuasive. This determination was within the ALJ's province. *See Siemers v. Shalala*, 47 F.3d 299, 302 (8th Cir. 1995); *Ownbey v. Shalala*, 5 F.3d 342, 345 (8th Cir. 1993).

### 4.      **Activities of Daily Living:**

Plaintiff's own reports concerning his daily activities also undermine his claim of disability. In a questionnaire Plaintiff prepared for his attorney, he indicated that he sat for nine hours per day and stood or walked for eight hours per day. Tr. 209. He also reported the ability to drive, watch his

17

children, watch television/listen to the radio for three hours, read for one hour, talk on the phone for one hour, sleep for seven hours, and groom himself daily; wash dishes, do the laundry, grocery shop, participate in organizations, go to church, teach karate classes, visit relatives, and exercise weekly; and, cook, clean the house, vacuum, mop the floor, fix things, pay bills and handle finances, pay cards/games, visit friends, and go out to eat or to movies monthly.  Tr. 210.  Plaintiff was also enrolled in the nursing program at a local college, participating in both clinical rotations and lectures.  *See Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996) (ability to care for one child, occasionally drive, and sometimes go to the store); *Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996) (ability to visit neighbors, cook, do laundry, and attend church); *Novotny v. Chater*, 72 F.3d at 671 (ability to carry out garbage, carry grocery bags, and drive); *Johnston v. Shalala*, 42 F.3d 448, 451 (8th Cir. 1994) (claimant's ability to read, watch television, and drive indicated his pain did not interfere with his ability to concentrate); *Woolf v. Shalala*, 3 F.3d 1210, 1213-1214 (8th Cir. 1993) (ability to live alone, drive, grocery shop, and perform housework with some help from a neighbor).  Further, Dr. Nichols also concluded that Plaintiff could care for his own personal hygiene, prepare meals infrequently, drive without assistance, attend college, attend church almost every week, and handle the household finances.  Tr. 300.  Likewise, Dr. Harris indicated that Plaintiff could care for his personal needs, drive, shop for groceries and clothing, perform household chores, use a debit card, and make simple change.  Tr. 329.  Clearly, these are not the daily activities one would expect a disabled person to be able to perform.

**B.      The ALJ's RFC Assessment:**

We next examine the ALJ's RFC assessment.  RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1).  A disability claimant has the burden of establishing his or her RFC.  *See Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir.2004).  "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or his limitations."

*Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).  Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3).  The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001).  Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." *Lewis v. Barnhart,* 353 F.3d 642, 646 (8th Cir. 2003).

The ALJ properly considered plaintiff's subjective complaints, the objective medical evidence, Dr. Lee's assessment, and the assessments of the non-examining, consultative doctors.  On July 1, 2008, Dr. Alice Davidson completed a physical RFC assessment.  Tr. 227-234.  After reviewing Plaintiff's medical records, she concluded Plaintiff could perform a full range of light work.  Tr. 227-234.  This assessment was affirmed by Dr. Jim Takach on October 16, 2008.  Tr. 318.

On December 1, 2008, Dr. Kay Gale completed a psychiatric review technique form.  Tr. 304-317.  After reviewing Plaintiff's medical records, Dr. Gale diagnosed him with a memory impairment. She determined this would result in only mild restriction of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace. Further, no episodes of decompensation were noted.  Tr. 304-317.

Plaintiff contends that the ALJ erred in her treatment of Dr. Lee's assessment.  We note, however, that aside from Dr. Lee's claim to have treated Plaintiff twice annually for four years, the record contains no treatment notes or records from his office.  It is Plaintiff's argument that the ALJ bears the burden of fully developing the record, and that this assessment should have placed her on notice that further development was necessary in this regard.  We note, however, that no reference was made to a Dr. Lee during the hearing.  Plaintiff testified that he did not see doctors regularly because he had no insurance and no money to pay for their services.  Given the fact that there were no references

made to any treatment by Dr. Lee and that Dr. Lee's assessment was submitted after the date of the hearing, we do not believe the ALJ had a duty to request additional information.  It seems to the undersigned that had medical records from Dr. Lee existed, Plaintiff would have placed them into evidence in an effort to meet his burden of persuasion to prove his disability and demonstrate his RFC. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

We also note that Plaintiff was able to perform the requirements of his nursing clinical assignments for six hours one day per week, sit for a four hour lecture class one day per week, and teach martial arts classes on a part-time basis.  He also reported the ability to sit for nine hours per day, stand and walk for 8 hours per day, watch television/listen to the radio for three hours daily, read for one hour daily, and talk on the phone for one hour daily.  We note that the duties of a registered nurse are classified as medium level work in the Dictionary of Occupational Titles.  *See* DICTIONARY OF OCCUPATIONAL TITLES, § 075.364-010.  As Plaintiff was performing some of the duties of a nurse during his clinical rotations at the hospitals, it seems clear to the undersigned that he should also be able to perform the range of light work determined by the ALJ.  Accordingly, we find substantial evidence to support the ALJ's determination that Plaintiff could perform light work  requiring only occasional pushing/pulling with his bilateral upper extremities, overhead reaching, and exposure to extremes of temperature and humidity and no climbing ladders/ropes/scaffolds, performing outside work, and tolerating exposure to unprotected heights.

**C.     Vocational Expert's Testimony:**

Testimony from a vocational expert based on a properly-phrased hypothetical question constitutes substantial evidence.  *See Cruze v. Chater,* 85 F.3d 1320, 1323 (8th Cir. 1996); *cf. Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994) (when hypothetical question does not encompass all relevant impairments, VE's testimony does not constitute substantial evidence to support the ALJ's decision). The ALJ's hypothetical question needs to "include only those impairments that the ALJ finds are

20

substantially supported by the record as a whole." *Id.* (citing *Stout v. Shalala,* 988 F.2d 853, 855 (8th Cir.1993)); *see also Morse v. Shalala,* 32 F.3d 1228, 1230 (8th Cir.1994).

The vocational expert testified that a person of plaintiff's age, education, and work background with the above RFC, could still perform work as a cashier II, machine tender, and inspector/tester.  Tr. 72-73.  As the hypothetical questioned posed to the vocational expert contained all of the limitations the ALJ found to be imposed by Plaintiff's impairments, we hold that the vocational experts testimony constitutes substantial evidence to support the ALJ's decision.

**V.**     **Conclusion:**

Accordingly, having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decision denying the plaintiff benefits, and thus the decision should be affirmed. The undersigned further finds that the plaintiff's Complaint should be dismissed with prejudice.

DATED this 22nd day of February 2012.

/s/ *J. Marschewski*

HON. JAMES R. MARSCHEWSKI
CHIEF UNITED STATES MAGISTRATE JUDGE

21

AO72A
(Rev. 8/82)